Bevin Allen Pike (SBN 221936)
Bevin.Pike@capstonelawyers.com
Robert K. Friedl (SBN 134947)
Robert.Friedl@capstonelawyers.com
Trisha K. Monesi (SBN 303512)
Trisha.Monesi@capstonelawyers.com
Capstone Law APC
1875 Century Park East, Suite 1000
Los Angeles, California 90067
Telephone:     (310) 556-4811
Facsimile:     (310) 943-0396

Attorneys for Plaintiffs Georgia Tryan
and Marilyn Echols

UNITED STATES DISTRICT COURT

EASTERN DISTRICT OF CALIFORNIA

| | |
|---|---|
| GEORGIA TRYAN and MARILYN ECHOLS, as individuals, and on behalf of other members of the general public similarly situated,<br><br>        Plaintiffs,<br><br>    v.<br><br>ULTHERA, INC., a Delaware corporation; and MERZ NORTH AMERICA, INC., a Delaware corporation,<br><br>        Defendants. | Case No.:<br><br>**CLASS ACTION COMPLAINT FOR:**<br><br>(1)   Violations of California's Consumers Legal Remedies Act;<br>(2)   Violation of False Advertising Law, California Business & Professions Code § 17500; and<br>(3)   Violation of Unfair Competition Law, California Business & Professions Code § 17200 *et seq*.<br><br>**DEMAND FOR JURY TRIAL** |

**INTRODUCTION**

1.      Plaintiffs Georgia Tryan and Marilyn Echols ("Plaintiffs") bring this action for themselves and on behalf of all persons in the United States who, at any time in the last four years prior to the filing of this complaint, purchased one or more Ultherapy procedures. "Ultherapy" is a non-surgical cosmetic procedure that utilizes several medical device components (the "Ulthera System") designed, manufactured, marketed, distributed, and sold by Ulthera, Inc. and Merz North America, Inc., formerly Merz Aesthetics, Inc. ("Ulthera," "Merz," or "Defendants").

2.      This case arises out of the unlawful, false, misleading, and deceptive marketing practices used by Defendants regarding Ultherapy.  Defendants have deceptively led customers to believe that they were purchasing, for a premium price, medical treatments that have undergone the rigorous FDA-approval process, with all the safety and efficacy that such approval and endorsement signifies.  Yet, Defendants' Ulthera System, used in performing the Ultherapy procedure, has not received premarket FDA approval ("PMA") but rather, has merely obtained 510(k) premarket notification clearance ("510(k) clearance"), a crucial distinction that Defendants misrepresent to consumers.  In short, PMA requires independent trials and testing by the Federal Food & Drug Administration (the "FDA"), and constitutes the FDA's official endorsement as to the safety and efficacy of a medical device.  In contrast, 510(k) clearance merely entails a finding by the FDA that a new medical device is substantially equivalent to a pre-existing device marketed before the enactment date of the Medical Device Amendments (MDA) to the Federal Food, Drug and Cosmetic Act (FDCA).

3.      To increase revenue and gain an advantage over competitors, Defendants represent to consumers that their Ultherapy procedure is "FDA approved" and thus, has received the FDA's official endorsement.  This conduct violates regulations promulgated by the FDA pursuant to the FDCA, which state:

> **Sec. 807.97** Misbranding by reference to premarket notification.
>
> Submission of a premarket notification in accordance with this subpart, and a subsequent determination by the Commissioner that the device intended for introduction into commercial distribution is substantially equivalent to a

device in commercial distribution before May 28, 1976, or is substantially equivalent to a device introduced into commercial distribution after May 28, 1976, that has subsequently been reclassified into class I or II, does not in any way denote official approval of the device. **Any representation that creates an impression of official approval of a device because of complying with the premarket notification regulations is misleading and constitutes misbranding.**

21 C.F.R. § 807.97 (emphasis added).

4.      California's Sherman Food, Drug, and Cosmetic Law (the "Sherman Law"), Cal. Health & Safety Code §§ 109875-111915, incorporates and mirrors the FDCA, including without limitation, 21 CFR § 807.97.  The Sherman Law further provides that "[i]t is unlawful for any person to disseminate any false advertisement of any food, drug, device, or cosmetic. An advertisement is false if it is false or misleading in any particular."  Cal. Health & Safety Code § 110390.  These regulatory and statutory violations, among others, serve as predicate violations for Plaintiffs' UCL, FAL and CLRA claims asserted herein.

5.      As Defendants know, the global market for aesthetic procedures is significant.  In fact, following the announcement of Merz's acquisition of Ulthera in 2014 for reportedly over $600 million, Philip Burchard, CEO of Merz Pharma Group, stated, "We have a vision to be the most innovative company in aesthetics. […] The addition of Ulthera's energy device technology complements and expands our global presence in the aesthetics space."[1]  Defendants market Ultherapy extensively throughout the United States to consumers, described more fully below, and advance their deceptive representations through "comprehensive marketing resources"[2] and support provided to physicians and other medical professionals who purchase the Ulthera system and perform the Ultherapy procedure.

6.      Defendants recognize the significance of the FDA's official endorsement of

---

[1] Merz North America, Press Releases, "Merz To Acquire Ulthera, Inc., A Leading Energy Device Company In The Area Of Non-Surgical Lift," *available at* http://www.merzusa.com/wp-content/uploads/Merz-to-Acquire-Ulthera.pdf

[2] "The Provider Portal equips Merz North America customers with comprehensive marketing resources, designed to drive patient engagement in your practice. Please explore the portal to learn more about how Merz products, promotions and training materials can benefit your business." http://www.merzusa.com/healthcare-provider-portal/

1   medical devices to consumers and falsely represent that the Ulthera System is "FDA approved,"

2   conveying to reasonable consumers that the Ulthera medical devices and procedure has the

3   FDA's endorsement as to the safety and efficacy of Ultherapy.

4          7.      In fact, the FDA expressly notified Defendants that the Ulthera System's 510(k)

5   premarket clearance "does not in any way denote official approval of the device" and "[a]ny

6   representation that creates an impression of official approval of a device because of complying

7   with the premarket notification regulations is misleading and constitutes misbranding."  21

8   C.F.R. § 807.97.  Despite this, Defendants have made the following claims, discussed more

9   fully below, directly to consumers on Ulthera's official Facebook page[3] and website and in

10   advertisements and marketing materials provided to its customers:



11
12
13
14
15
16
17
18
19
20
21
22
23
24
25
26
27

28       [3] https://www.facebook.com/Ultherapy/

1
2
3
4
5
6
7
8
9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25
26
27
28





1
2
3
4
5
6
7
8
9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25
26
27
28



1    8.    Nowhere in Defendants marketing materials or advertising campaign do they

2 ever explain or clarify that Ultherapy has only been reviewed by the FDA in accordance with

3 premarket notification requirements and has not received the FDA's official approval or

4 endorsement as to the safety and efficacy of the medical devices or procedure.  Further,

5 Defendants fail to even suggest to consumers that 510(k) clearance differs from PMA, or FDA

6 approval.

7    9.    Instead, by interchangeably claiming that Ultherapy is "FDA approved" and

8 "FDA cleared," Defendants have capitalized on reasonable consumers' understanding of FDA

9 approval and lack of understanding of FDA "clearance" in relation to the safety, efficacy, trials,

10 testing, etc. of medical devices.  Defendants' use of these terms in marketing materials conveys

11 to consumers an official endorsement by the FDA.

12    10.    By creating an impression of FDA approval and endorsement as to the safety and

13 efficacy of Ultherapy to reasonable consumers, Defendants command a premium price,

14 increasing consumers' willingness to pay and reduce the market share of competing products,

15 thereby increasing their own sales and profits.

16    11.    Reasonable consumers must, and do, rely on Defendants' overall marketing,

17 including, without limitation, television, radio, print media, posters, office displays, and

18 brochures provided to consumers by certified physicians and technicians trained by Defendants

19 to perform and market the Ultherapy procedure.  As such, reasonable consumers remain

20 unaware that they are not receiving treatments that have undergone the rigorous FDA approval

21 process.

22    12.    If Plaintiffs and Class Members knew that the Ulthera System and/or procedure

23 had not undergone the rigorous review and testing process of FDA approval, Plaintiffs and Class

24 Members would not have purchased and undergone the procedures or would have paid less for

25 them.

26    13.    By employing the marketing tactics illustrated above, Ulthera and Merz intend

27 for consumers to rely on their representations regarding the FDA's endorsement of Ultherapy,

28 when in fact no endorsement has been given.  Because Defendants continue to advertise

Ultherapy as "FDA approved" or otherwise suggest to consumers that Ultherapy has the FDA's endorsement as to the safety and efficacy of the devices and/or procedure, Plaintiffs and Class Members (as well as members of the general public) remain subject to Defendants' deceptive advertising.

14.    As a result of their reliance on Defendants' misrepresentations and omissions, consumers have suffered an ascertainable loss of money, including, but not limited to, out of pocket costs incurred in purchasing the Ultherapy procedure.  Further, as a result of their deceptive marketing and unfair competition with other, similar manufacturers and brands, Defendants realized sizable profits.

## PARTIES

### PLAINTIFF Georgia Tryan

15.    Plaintiff Georgia Tryan is a California citizen who resides in Burney, California. During the class period alleged herein, specifically on or around November 19, 2015, Plaintiff Tryan purchased an Ultherapy treatment from Orlino Oliva Editha C Inc., a medical practice authorized by Defendants to perform the Ultherapy procedure, in Shasta County, California.

16.    Prior to purchasing Ultherapy, Plaintiff Tryan saw, and relied upon, Defendants' advertising materials, including displays and brochures provided by Defendants to authorized medical practices for distribution to consumers, specifically regarding the representations stating that Ultherapy was "FDA approved."  For example, Plaintiff Tryan relied upon the following representation made by Defendants in their Ultherapy brochure provided to her prior to purchasing the procedure.



17.     Based on Defendants' representations regarding FDA approval, Plaintiff Tryan reasonably believed that Ultherapy was approved by the FDA.

18.     FDA approval was important to Plaintiff Tryan in deciding to purchase and undergo Ultherapy because she reasonably believed that the FDA's approval assured the safety and efficacy of the Ultherapy devices and procedure.  In fact, Defendants' representations indicating the FDA's purported endorsement throughout its marketing materials were material to Plaintiff Tryan in her decision to purchase Ultherapy.

19.     If Defendants had disclosed their knowledge of Ultherapy's lack of FDA approval prior to her purchase, Plaintiff Tryan would have seen or heard such representations and been aware of them.  If Plaintiff Tryan had known at the time of purchase that Ultherapy was not approved by the FDA, she would have paid less for the treatment, declined to purchase the treatment, and/or considered alternative treatments that were FDA approved.

**PLAINTIFF Marilyn Echols**

20.     Plaintiff Marilyn Echols is a California citizen who resides in Paramount, California.  During the class period alleged herein, specifically in or around September 2015,

Plaintiff Echols purchased an Ultherapy treatment from Laser Skin Care Center, a medical practice authorized by Defendants to perform the Ultherapy procedure, in Los Angeles County, California.

21.     Prior to purchasing Ultherapy, Plaintiff Echols saw, and relied upon, Defendants' online social media advertising, printed marketing materials, including brochures provided by Defendants to Ultherapy-authorized medical practices, and reviewed Defendants' official Ultherapy website, all of which specifically represented or suggested that the device and procedure was approved by the FDA.  Based on these representations by Defendants, Plaintiff Echols reasonably believed that Ultherapy was approved by the FDA.

22.     FDA approval was important to Plaintiff Echols in deciding to purchase and undergo Ultherapy because she reasonably believed that the FDA's approval assured the safety and efficacy of the Ultherapy devices and procedure.  In fact, Defendants' representations indicating FDA's purported endorsement of Ultherapy in Facebook advertisements, printed brochures, and throughout Defendants' Ultherapy website were material to Plaintiff Echols in her decision to purchase Ultherapy.

23.     If Defendants had disclosed their knowledge of Ultherapy's lack of FDA approval prior to her purchase, Plaintiff Echols would have seen or heard such representations and been aware of them.  If Plaintiff Echols had known at the time of purchase that Ultherapy was not approved by the FDA, she would have paid less for the treatments, declined to undergo the treatments, and/or considered alternative treatments that were FDA approved.

**DEFENDANT**

24.     Defendant Merz North America, Inc., formerly Merz Aesthetics, Inc., is a corporation organized and in existence under the laws of the State of Delaware and is registered to do business in the State of California.  Merz's corporate headquarters and principal place of business is located at 6501 Six Forks Road, Raleigh, North Carolina 27615.  Merz tests, produces, manufactures, markets, distributes, and sells the Ulthera System worldwide, nationwide, and throughout California.

25.     Defendant Ulthera, Inc. is a corporation organized and in existence under the

CLASS ACTION COMPLAINT

laws of the State of Delaware.  Ulthera, Inc. was acquired by Merz North America in July 2014 and has since operated as a wholly owned subsidiary of Merz North America.  Prior to its acquisition, Ulthera was registered to do business in the State of California.  Ulthera's corporate headquarters and principal place of business is located at 1840 S. Stapley Dr., Suite 200, Mesa, Arizona 85204.  Ulthera designed, tested, produced, manufactured, marketed, distributed, and sold the Ulthera System nationwide and throughout California.

26.    At all relevant times, Defendants were and are engaged in the business of designing, testing, producing, manufacturing, marketing, distributing, and selling the Ulthera System in Shasta County, Los Angeles County, and throughout the United States of America.

**JURISDICTION**

27.    This is a class action.

28.    This Court has subject matter jurisdiction over this matter pursuant to 28 U.S.C. § 1331 because this action arises under the Constitution or laws of the United States and the Class Action Fairness Act, 28 U.S.C. § 1332(d)(2) and (6), in that, as to each Class defined herein:

    a.  the matter in controversy exceeds $5,000,000.00, exclusive of interest and costs;

    b.  this is a class action involving 100 or more class members; and

    c.  this is a class action in which at least one member of the Plaintiff class is a citizen of a State different from at least one Defendant.

29.    The Court has personal jurisdiction over Defendants, which have at least minimum contacts with the State of California because they have conducted business there and have availed themselves of California's markets through the designing, manufacturing, constructing, assembling, advertising, distributing, and selling of Ultherapy.

**VENUE**

30.    Ulthera and Merz, through their business of advertising, distributing, and selling Ultherapy, have established sufficient contacts in this district such that personal jurisdiction is appropriate.  Defendants are deemed to reside in this district pursuant to 28

1   U.S.C. § 1391(a).

2       31.     In addition, a substantial part of the events or omissions giving rise to these

3   claims and a substantial part of the property that is the subject of this action are in this district.

4   In addition, Plaintiff Tryan's Declaration, as required under California Civil Code section

5   1780(d) (but not pursuant to *Erie* and federal procedural rules), reflects that a substantial part

6   of the events or omissions giving rise to the claims alleged herein occurred, or a substantial

7   part of property that is the subject of this action, is situated in Shasta County, California.  It is

8   attached as **Exhibit 1.**

9       32.     Venue is proper in this Court pursuant to 28 U.S.C. § 1391(a).

10                          **FACTUAL ALLEGATIONS**

11      33.     The global market for aesthetic procedures is significant.  In fact, following the

12  announcement of Merz's acquisition of Ulthera in 2014 for reportedly over $600 million, Philip

13  Burchard, CEO of Merz Pharma Group, stated, "We have a vision to be the most innovative

14  company in aesthetics. […] The addition of Ulthera's energy device technology complements

15  and expands our global presence in the aesthetics space."[4]  Defendants market Ultherapy

16  extensively throughout the United States to consumers, described more fully below, and

17  advance their deceptive representations through "comprehensive marketing resources"[5] and

18  support provided to physicians and other medical professionals who purchase the Ulthera

19  system and perform the Ultherapy procedure.  Defendants market Ultherapy extensively

20  throughout North America, specifically touting Ultherapy's FDA clearance and approval.

21      34.     By stating that Ultherapy is "FDA approved" throughout marketing materials

22  provided to consumers and on their social media accounts and official website, Defendants have

23  _____

24      [4] Merz North America, Press Releases, "Merz To Acquire Ulthera, Inc., A Leading
    Energy Device Company In The Area Of Non-Surgical Lift," *available at*
25  http://www.merzusa.com/wp-content/uploads/Merz-to-Acquire-Ulthera.pdf

26      [5] "The Provider Portal equips Merz North America customers with comprehensive
    marketing resources, designed to drive patient engagement in your practice. Please explore the
27  portal to learn more about how Merz products, promotions and training materials can benefit
    your business." http://www.merzusa.com/healthcare-provider-portal/
28

capitalized on reasonable consumers' understanding (or lack thereof) of FDA terminology. Reasonable consumers, like Plaintiffs, do not know and are not informed by Defendants of the vast differences between "FDA approval" through a Premarket Approval Application (PMA) and "FDA 510(k) premarket clearance" or simply "FDA clearance," especially in relation to the FDA's review of the safety, efficacy, clinical trials, and testing results of Ultherapy.  In fact, Defendants use "FDA approved" and "FDA cleared" interchangeably throughout their marketing materials.  Thus, Defendants have misbranded Ultherapy pursuant to 21 CFR § 807.97:

> Submission of a premarket notification in accordance with this subpart, and a subsequent determination by the Commissioner that the device intended for introduction into commercial distribution is substantially equivalent to a device in commercial distribution before May 28, 1976, or is substantially equivalent to a device introduced into commercial distribution after May 28, 1976, that has subsequently been reclassified into class I or II, ***does not in any way denote official approval of the device. Any representation that creates an impression of official approval of a device because of complying with the premarket notification regulations is misleading and constitutes misbranding***. (emphasis added).

35.     The FDA has warned Defendants since at least 2011, in every premarket notification letter to Ulthera, that the "**FDA's issuance of a substantial equivalence determination does not mean that FDA has made a determination that your device complies with other requirements of the Act or any Federal statutes and regulations administered by other Federal agencies. […] Also, please note the regulation entitled, "Misbranding by reference to premarket notification" (21 CFR Part 807.97)**."[6]

36.     The Medical Device Amendments of 1976 to the FDCA established three "classes" of medical devices: Class I, II, and III.  "The three classes are based on the degree of control necessary to assure that the various types of devices are safe and effective."[7]  A post-1976 medical device is automatically placed into Class III and is subject to premarket approval

---

[6] FDA 510(k) Premarket Notification Database, Search for Ulthera, *available at* https://www.accessdata.fda.gov/scripts/cdrh/cfdocs/cfpmn/pmn.cfm
[7] https://www.fda.gov/MedicalDevices/ProductsandMedicalProcedures/ DeviceApprovalsandClearances/PMAApprovals/default.htm

requirements, including the FDA's independent "scientific review to ensure the safety and effectiveness" of the device.  However, manufacturers can avoid the FDA's thorough scientific review and approval process by submitting a 510(k) Premarket Notification for "FDA clearance" to market the device based on its similarities to pre-1976 devices.

37.     Therefore, it behooves a manufacturer to link their "new" medical device to a pre-1976 device, to avoid costly and time-consuming FDA review and get their products to the market quicker.  Medical devices that go through this less stringent, fast-tracked FDA review process attain 510(k) clearance to market the device.  By contrast, PMA is extremely rigorous, and requires a manufacturer to present the FDA with "all information" known or reasonably knowable about the device, including detailed information about the design, manufacture, uses, and labeling of the device.  To obtain PMA approval of a medical device, the FDA conducts its own independent testing of the device and must find that the medical device has *sufficient scientific evidence showing the device is safe and effective for its intended use*.  Only then is a medical device manufacturer permitted to use the term "FDA-approved" in its marketing of a medical device.

38.     The significant evidence needed to obtain FDA-approval of a medical device is not required when a medical device manufacturer applies for FDA clearance via the 510(k) premarket notification process.  Section 510(k) of the FDCA allows manufacturers, like Defendants, to submit a "summary" to the FDA "describing" how its medical device is "substantially equivalent" to a pre-1976 device and the intended use of the device.

39.     In June 2011, the FDA found Ulthera's "Focused Ultrasound Stimulator System for Aesthetic Use," the "Ulthera System," substantially equivalent to pre-1976 Class II medical devices that use "focused ultrasound to produce localized, mechanical motion within tissues and cells for the purpose of producing either localized hearing for tissue coagulation or for mechanical cellular membrane disruption intended for non-invasive aesthetic use."  At that time, the FDA also advised Ulthera that "persons who intend to market this device type must submit to FDA a premarket notification submission containing information on the Focused Ultrasound Stimulator System for Aesthetic Use they intend to market prior to marketing the device and

receive clearance to market from FDA." At no point did the FDA perform the rigorous, independent testing to ensure the safety and effectiveness of Ultherapy resulting from the Premarket Approval procedures and, as such, the FDA has not endorsed or approved the safety and efficacy of Ultherapy.

40.     Regarding their marketing strategy of Ultherapy, Defendants state, "We utilize a variety of advertising media, such as traditional and online radio advertising, digital advertising and print as part of our direct-to-consumer marketing strategy in order to increase consumer awareness, drive traffic to the Ultherapy.com website and connect prospective patients to practices. We also have a cost-effective, yet robust public relations program that has garnered millions of consumer impressions through coverage on major national TV shows such as *The Today Show, The View, Good Morning America* and *The Rachael Ray Show.* We have used social media to not only generate consumer awareness, but to increase engagement and conversion. The buzz marketing campaign "Old Scarf, New Neck" designed to increase awareness of our unique neck lift indication was an example of a fully integrated promotion that utilized social media, PR and advertising. We also intend to continue our social media campaigns, using platforms such as Facebook, YouTube, Pinterest and Twitter."[8]

41.     Through these direct-to-consumer channels, Defendants have promoted Ultherapy with claims that the procedure has been "FDA approved" and "FDA cleared" in virtually *all* of their advertising and marketing materials, deceptively implying to consumers that the FDA has approved or otherwise endorsed Ultherapy's safety and efficacy for its stated purposes. Ulthera further misleads and confuses consumers by making the claims "FDA approved" and "FDA cleared" interchangeably, sometimes within the same marketing materials. Yet Defendants never clarify, explain, or even attempt to inform consumers that "FDA clearance" is *not* equivalent to the widely-known and understood "FDA approval" claims. Examples of Defendants' misleading advertisements from its website, and Facebook and YouTube accounts (screenshots below taken on Sept. 27, 2017), are shown below.

---

[8] U.S. Securities and Exchange Commission, 2014 Form S-1 Registration Statement, Amend. 2, Ulthera, Inc., available at https://www.sec.gov (last visited Sept. 27, 2017).

1
2
3
4
5
6
7
8
9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25
26
27
28



CLASS ACTION COMPLAINT

1
2
3
4
5
6
7
8
9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25
26
27
28





42.     Defendants knew, or should have known, that reasonable consumers rely on their claims stating or implying Ultherapy has received the FDA's official endorsement or approval and knew, or should have known, that the FDA's approval is important to consumers when deciding to purchase Ultherapy.  In fact, the FDA requires Defendants to submit Adverse Event Reports[9] to the FDA as a condition of Ultherapy's 510(k) clearance.  Some of those reports shown below revealed to Defendants that consumers reasonably believed the Ultherapy procedure was FDA approved, when it was not.  Yet Defendants continued to advance their misbranding of Ultherapy by failing to explain or clarify that Ultherapy was in fact *not* FDA approved.  Because Defendants do not make this distinction in their advertising and marketing, Plaintiffs and Class Members (as well as members of the general public) remain subject to Defendants' deceptive advertising and misrepresentations.

**Ultherapy Adverse Events Reports**

- 01/10/2014 - I had permanent and substantial damage to my face after undergoing an ultherapy treatment in a plastic surgeons office. I experienced healthy fat loss, muscle atrophy/laxity and permanent eye shape change (eyeball and eyelid retraction). There was no 'skin tightening' as intended, just total damage to underlying tissue. **Ultherapy is a product of ulthera inc, (b)(4), and is an ultrasound technology that is currently approved by the fda for skin tightening/lifting and advertised as safe and without risk.** Unfortunately, many women are now claiming, on consumer review sites, that they too have experienced severe damage and side effects. It damages underlying tissue to the point of destruction, fat loss and muscle atrophy altering appearances dramatically. I am currently listed as a willing party on a potential class action law suit, that is gaining participants to move forward. Please address this complaint, this is a very serious risk to unsuspecting patients.
- 10/03/2014 - I had ultherapy done and it damaged my knees and caused fat and volume loss in my face. It also damaged my tissues. My face is twisting up on one side and now my teeth are suddenly changing. I have had a lot of mental and emotional effects as well, which can be verified by medical records. I have also not b een able to sleep, and that has affected and magnified previous conditions i had. This device will burn fat cells and they will not come back. So this is permanent damage. I cannot get the doctor who did this to respond or provide any of the documentation either. There are so many women now that have had their faces damaged by this device. **How and why it was ever approved absolutely astounds me. I trusted the doctor. People trust the fda. You need to pull this and any other device like it off the market.** If this is the same as ultrasound waves, those kill fish in the ocean. How can anyone use this on their face? especially even close or around the eyes? my eyes wer so damaged, i had to get surgery on them.
- 02/16/2015 - Was damaged by ultherapy. Facial fat loss and permanent scars on neck. Damage is ongoing. **Why is this device still on the market? why do you approve it?** medical conditions: none. Allergies: none. Important information: smoker.

_____

[9] *Available at* https://www.accessdata.fda.gov/scripts/cdrh/cfdocs/cfmaude/search.cfm (last visited September 25, 2017).

- 05/30/2015 - This is to report ultherapy/uthera (a modified ultrasound medical device for lifting skin on the face). I have received ultherapy on my face (b)(6) 2015. Now, 3 months after my ultherapy i have visible fat atrophy on half of my left cheek towards the ear, a massive loss of volume on my face, and a face which lost expression. No face lift. I have constant pain in the face. Doctors have confirmed the damage on my face. Ulthera is against the law refusing to record my complaint. They say that according to their fda clinical studies, heat does not escape out of the collagen layer in the neighboring layers, and that fat atrophy does not happen. Please record my problem and complaint that fat atrophy does occur. I am only one of the many victims. Most people are unaware of the possibility to record complaint and problems at your fda web site, therefore i urge fda to inform via mass media how they can file at your web site. Please check www. Realself. Com. I am (b)(6), healthy, well built, training in the gym every day. I had got a Ultherapy treatment done on my face, because i was told that it rejuvenates skin and lifts face with absolutely no risks! **They said to me that the technology is fda approved.**
- 08/17/2015 - I am the type of person who would never consider an invasive procedure, no matter how old i looked. I heard about ultherapy, and did many, many online searches. After doing what i thought was my due diligence, i decided to move forward and have ultherapy done on my neck at a cost of (b)(6). … My face has been totally ruined by ultherapy. I don't know how anyone is allowed to use this on unsuspecting people without a warning of the possible dangers. If i allowed myself, i could sink into an extremely deep depression over this. I have to fight it everyday. Really! i feel stupid. I feel victimized. And I feel that this is a total injustice. I also feel helpless to do much about it. These people are frauds and something has to be done to protect unsuspecting people like me. **How can this be fda approved? that assurance no longer means anything to me! it wasn't until the fat melted off my face and i (b)(6) 'fat loss' and ultherapy together that i saw any negative reviews of it.** There have been several women who have gone through the same trauma that i have. And it is trauma. To have your youth and your identity stolen is traumatic. What is the fda going to do about it? how many more lives have to be ruined? you are responsible for approving this machine and for all of the lives which have been ruined as a result. I would never hurt anyone and i wouldn't expect anyone to knowingly hurt me. But that's what has happened. I am devastated, and this damage is permanent.
- 03/17/2016 - **Went to have ultherapy treatment after reviewing ultherapy's website. Per ultherapy's website, i thought the treatment would be a safe, noninvasive procedure to "tone and tighten" a very small area underneath my chin that was beginning to show slight signs of aging.** I had ultherapy treatment at a reputable clinic on my lower face/neck ((b)(6)2016) before and after pictures are available. Since (b)(6) 2016, i've watched the targeted area (treated with ultherapy's medical device) under chin grow to a "massive double lump" of what appears to be "fat" with multiple layers of "new wrinkles" that i didn't have before. In addition, i am noticing lower face/jaw line has lost volume and appears to be sunken and thin. **I believed ultherapy to be a safe method based on their website and per ultherapy's website; ultherapy was cleared by fda.** Please help. I will now need surgery to correct this treatment.
- 08/22/2016 - I had ultherapy which has destroyed the volume and fat in my face. It seems as it is total laxity. **I understand this is a common issue with this fda approved procedure.** Please recall this device. Effects are as if my face is melting off my skin. It has only been one month and i fear it will only get worse.

43.     Further, Defendants control their brand by providing a great deal of support and training to the direct purchasers of the Ulthera System.  According to Ulthera, "Prior to contracting with a distributor, we have a vetting process to help ensure our brand is maintained. We require distributors to provide customer training, invest in marketing, and maintain high standards, as well as present the Ulthera System at industry meetings. We also hold regional

distributor meetings at regular intervals to share best practices and ensure they have the latest information on the Ulthera System."[10]

44.     Further, Defendants state, "In the United States, we have a team of field-based practice managers who are dedicated to helping physicians increase the number of Ultherapy procedures in their practices. These practice managers provide our customers with their initial clinical training on the Ulthera System and the Ultherapy procedure. The clinical training is designed to ensure that practices achieve positive outcomes from a safety and efficacy standpoint. The practice managers also provide ongoing marketing support to physician customers by helping them develop and implement a business plan. Our marketing team has developed an online portal that contains direct mail, e-blasts and other tools that physicians can access to promote Ultherapy treatments to their patients. The practice managers use the portal, as well as other seasonal campaigns, patient events and sales aids to grow Ultherapy procedures in our physician customers' practices. Finally, through an account segmentation process, we identify the needs of our customers and tailor the level of ongoing support as appropriate."[11]

45.     Thus, Defendants advance their deceptive claims to consumers about the FDA through extensive marketing support provided to direct customers.  For example, the Beverly Hills Rejuvenation Center, an Ultherapy "Ultra Premier Plus Provider" as indicated by Ulthera, currently promotes the following on its website:

Ultherapy non-surgical facelift is the only *non-invasive treatment* approved by the FDA to lift sagging skin. It is also the only cosmetic procedure to use ultrasound imaging, which allows practitioners to see the layers of tissue best targeted during treatment to give lasting results. On top of that, Ultherapy is the only non-invasive procedure specifically indicated by the FDA to improve lines and wrinkles on the chest.

Ultherapy: The FDA-Approved Procedure to Lift, Tighten and Tone Skin

The Beverly Hills Rejuvenation Center offers the Ultherapy Non-Surgical Facelift procedure.

---

[10] U.S. Securities and Exchange Commission, 2014 Form S-1 Registration Statement, Amend. 2, Ulthera, Inc., available at https://www.sec.gov (last visited Sept. 27, 2017).

[11] Id.

46. By creating an impression of FDA approval and endorsement as to the safety and efficacy of Ultherapy to reasonable consumers, Defendants are able to command a premium price, increasing consumers' willingness to pay and reduce the market share of competing products, thereby increasing their own sales and profits.

47. Reasonable consumers must, and do, rely on Defendants' overall marketing, including, without limitation, television, radio, print media, posters, office displays, and brochures provided to its customers by Ulthera-certified physicians and technicians. As such, reasonable consumers remain unaware that they are not receiving treatments that have undergone the rigorous FDA-approval process.

48. Defendants' deceptive marketing also poses a serious health concern and safety risk to consumers. By stating that Ultherapy has been endorsed by the FDA, and therefore has undergone the numerous studies, tests, and trials required for FDA approval, Defendants are putting consumers at risk.

49. By employing the marketing tactics illustrated above, Defendants intend for consumers to rely on its representations regarding the FDA's endorsement of Ultherapy, and thousands of reasonable consumers did in fact so rely.

50. If Plaintiffs and Class Members knew that Ultherapy was not FDA approved, Plaintiffs and Class Members would not have purchased Ultherapy treatments or would have paid less for them.

51. Defendants know, or should reasonably know, that consumers purchase Ultherapy, in part, because of the supposed endorsement and approval by the FDA, and know that consumers will, and do, pay a premium for these treatments, and/or would not purchase them at all without FDA approval.

52. As a result of their reliance on Defendants' representations, consumers have suffered an ascertainable loss of money, including, without limitation, out of pocket costs incurred in purchasing Ultherapy treatments. Further, as a result of their deceptive marketing and unfair competition with similar manufacturers and brands who do not tout FDA approval or clearance, despite having received it in order to market their devices, Defendants realized

1    sizable profits.

2    53.    As the intended, direct, and proximate result of Defendants' false, misleading,

3    and deceptive representations and omissions, Defendants have been unjustly enriched through

4    more sales of Ultherapy and higher profits at the expense of Plaintiffs and the Class Members.

5    <center>**CLASS ALLEGATIONS**</center>

6    54.    Plaintiffs bring this lawsuit as a class action on behalf of themselves and all

7    others similarly situated as members of the proposed Class pursuant to pursuant to Federal

8    Rules of Civil Procedure 23(a), 23(b)(2), 23(b)(3), and 23(c)(4). This action satisfies the

9    numerosity, commonality, typicality, adequacy, predominance, and superiority requirements of

10   those provisions.

11   55.    The Class and Sub-Class are defined as:

12   **Nationwide Class**:  All individuals in the United States who
     purchased one or more Ultherapy procedures from four years
13   prior to the filing of this complaint through the date of
     certification (the "Nationwide Class" or "Class").

14   **California Sub-Class**:  All members of the Nationwide Class
15   who reside in the State of California.

16   **CLRA Sub-Class**:  All members of the California Sub-Class
     who are "consumers" within the meaning of California Civil
17   Code § 1761(d).

18   56.    Excluded from the Class and Sub-Classes are: (1) Defendants, any entity or

19   division in which Defendants have a controlling interest, and their legal representatives, officers,

20   directors, assigns, and successors; (2) the Judge to whom this case is assigned and the Judge's

21   staff; (3) any Judge sitting in the presiding state and/or federal court system who may hear an

22   appeal of any judgment entered; and (4) those persons who have suffered personal injuries as a

23   result of the facts alleged herein.  Plaintiffs reserve the right to amend the Class and Sub-Class

24   definitions if discovery and further investigation reveal that the Class and Sub-Class should be

25   expanded or otherwise modified.

26   57.    Numerosity:  Although the exact number of Class Members is uncertain and can

27   only be ascertained through appropriate discovery, the number is great enough such that joinder

28   is impracticable.  The disposition of the claims of these Class Members in a single action will

1  provide substantial benefits to all parties and to the Court.  The Class Members are readily

2  identifiable from information and records in Defendants' possession, custody, or control.

3       58.  Typicality:  Plaintiffs' claims are typical of the claims of the Class in that

4  Plaintiffs, like all Class Members, were deceived by Defendants' statements regarding the FDA.

5  The representative Plaintiffs, like all Class Members, have been damaged by Defendants'

6  misconduct in that they have incurred the over-valued costs of purchasing an Ultherapy

7  treatment for a premium price in reliance on Defendants' representations.  Furthermore, the

8  factual bases of Defendants' misconduct are common to all Class Members and represent a

9  common thread resulting in injury to all Class Members.

10       59.  Commonality:  There are numerous questions of law and fact common to

11  Plaintiffs and the Class that predominate over any question affecting only individual Class

12  Members.  These common legal and factual issues include the following:

13      a.  Whether Defendants misrepresented and/or failed to disclose material facts

14         concerning the Ulthera System or Ultherapy procedure;

15      b.  Whether the Ulthera System and treatments are misbranded under federal and/or

16         state laws;

17      c.  Whether Defendants' conduct was unlawful, unfair and/or deceptive;

18      d.  Whether Defendants have a duty to disclose the true nature of the FDA's

19         involvement with or approval of the Ulthera System and the distinction between

20         clearance and approval;

21      e.  Whether Plaintiffs and other Class Members are entitled to equitable relief,

22         including but not limited to a preliminary and/or permanent injunction;

23      f.  Whether Plaintiffs and other Class Members are entitled to damages;

24      g.  Whether Defendants knew or reasonably should have known of their deceptive

25         representations and omissions relating to the Ulthera System; and

26      h.  Whether Defendants are obligated to inform Class Members of their right to seek

27         reimbursement for having paid for Ultherapy treatments in reliance on

28         Defendants' misrepresentations.

60.     <u>Adequate Representation</u>:  Plaintiffs will fairly and adequately protect the interests of the Class Members.  Plaintiffs have retained attorneys experienced in the prosecution of class actions, including consumer and product defect class actions, and Plaintiffs intend to prosecute this action vigorously.

61.     <u>Predominance and Superiority</u>:  Plaintiffs and Class Members have all suffered and will continue to suffer harm and damages as a result of Defendants' unlawful and wrongful conduct.  A class action is superior to other available methods for the fair and efficient adjudication of the controversy.  Absent a class action, most Class Members would likely find the cost of litigating their claims prohibitively high and would therefore have no effective remedy at law.  Because of the relatively small size of the individual Class Members' claims, it is likely that only a few Class Members could afford to seek legal redress for Defendants' misconduct.  Absent a class action, Class Members will continue to incur damages, and Defendants' misconduct will continue without remedy.  Class treatment of common questions of law and fact would also be a superior method to multiple individual actions or piecemeal litigation in that class treatment will conserve the resources of the courts and the litigants, and will promote consistency and efficiency of adjudication.

# FIRST CAUSE OF ACTION

**(Violation of California's Consumers Legal Remedies Act, California Civil Code § 1750, et seq.,)**

62.     Plaintiffs incorporate by reference the allegations contained in each and every paragraph of this Complaint.

63.     Plaintiffs bring this cause of action on behalf of themselves and on behalf of the members of the CLRA Sub-Class.

64.     Defendants are "person(s)" as defined by California Civil Code § 1761(c).

65.     Plaintiffs and CLRA Sub-Class Members are "consumers" within the meaning of California Civil Code § 1761(d) because they purchased Ultherapy for personal use.

66.     By failing to disclose to Plaintiffs and prospective Class Members and concealing the true and actual nature of the FDA's review of the Ulthera System and the

resulting premarket clearance of the device, Defendants violated California Civil Code § 1770(a), as they represented that the Ulthera System had characteristics and benefits that it does not have, represented that the Ulthera System was of a particular standard, quality, or grade when it was of another, and advertised the Ulthera System with the intent not to sell as advertised.  See Cal. Civ. Code §§ 1770(a)(5)(7) & (9).

67.     Defendants' deceptive acts or practices occurred repeatedly in Defendants' trade or business and were capable of deceiving a substantial portion of the purchasing public.

68.     Defendants knew Ultherapy did not possess the characteristics and benefits as represented and were not of the particular standard, quality or grade as represented.

69.     As a result of their reliance on Defendants' representations and omissions, Class Members suffered an ascertainable loss of money, property, and/or value of the Ultherapy procedure.

70.     Defendants were under a duty to Plaintiffs and Class Members to disclose the true and actual nature of the FDA's review and clearance of Ultherapy because:

  a. Defendants were in a superior position to know the true nature of the FDA's review of the Ulthera System;

  b. Plaintiffs and Class Members could not reasonably have been expected to know the distinction between FDA clearance and FDA approval; and

  c. Defendants knew that Plaintiffs and Class Members could not reasonably have been expected to know the distinction between FDA clearance and FDA approval.

71.     In failing to disclose and misrepresenting the true nature of the FDA's clearance of Ultherapy, Defendants knowingly and intentionally concealed material facts and breached their duty not to do so.

72.     The facts Defendants concealed from or misrepresented to Plaintiffs and Class Members are material in that a reasonable consumer would have considered them to be important in deciding whether to purchase Ultherapy or pay less.  If Plaintiffs and Class Members had known that Ultherapy was not FDA approved, they would not have purchased the

treatments or would have paid less for them.

73.     Plaintiffs and Class Members are reasonable consumers who expect manufacturers, like Defendants, to provide accurate and truthful representations regarding the safety and efficacy of their products.  Further, reasonable consumers, like Plaintiffs, rely on the representations made by manufacturers regarding the safety and efficacy of their medical devices in determining whether to purchase and consider that information important to their purchase decision.

74.     As a direct and proximate result of Defendants' unfair methods of competition and/or unfair and deceptive practices, Plaintiffs and the Class have suffered and will continue to suffer actual damages.

75.     Plaintiffs and the Class are entitled to equitable relief.

76.     Plaintiffs provided Defendants with notice of its violations of the CLRA pursuant to California Civil Code § 1782(a).  Defendants failed to provide appropriate relief for its violations of the CLRA within 30 days.  Therefore, Plaintiffs now seek monetary, compensatory, and punitive damages, in addition to injunctive and equitable relief.

## SECOND CAUSE OF ACTION

### (Violation of California Business & Professions Code § 17500 et seq.)

77.     Plaintiffs incorporate by reference the allegations contained in each and every paragraph of this Complaint.

78.     Plaintiffs bring this cause of action on behalf of themselves and on behalf of the Nationwide Class, or in the alternative, on behalf of the California Sub-Class.

79.     California Business & Professions Code § 17500 prohibits unfair, deceptive, untrue, and misleading advertising in connection with the disposal of personal property (among other things), including, without limitation, false statements as to the use, worth, benefits, or characteristics of the property.

80.     Defendants have committed acts of untrue and misleading advertising by engaging in false representations as to the true nature of the FDA's review and approval of Ultherapy in violation of the FDCA per 21 C.F.R. § 807.97, which states that "[a]ny

representation that creates an impression of official approval of a device because of complying with the premarket notification regulations is misleading and constitutes misbranding", and Cal. Health & Safety Code § 110390 which provides that "[i]t is unlawful for any person to disseminate any false advertisement of any food, drug, device, or cosmetic. An advertisement is false if it is false or misleading in any particular." In addition, Defendants made such untrue or misleading advertisements with the intent to dispose of said products and/or services.

81.    Defendants knew, or in the exercise of reasonable care should have known, that these representations were misleading and deceptive. Defendants' misleading representations and omissions regarding Ultherapy were, and continue to be, likely to deceive members of the public.

82.    As a result of their reliance on Defendants' misrepresentations and omissions, Class Members suffered an ascertainable loss of money, property, and/or value of their Ultherapy treatments.

83.    As a direct and proximate result of Defendants' unfair and deceptive practices, Plaintiffs and the Class have suffered and will continue to suffer actual damages.

84.    Defendants have been unjustly enriched and should be required to make restitution to Plaintiffs and the Class. Pursuant to § 17535 of the Business & Professions Code, Plaintiffs and Class Members are entitled to an order of this Court enjoining such future conduct on the part of Defendants, and such other orders and judgments which may be necessary to disgorge Defendants' ill-gotten gains and restore to any person in interest any money paid for the Ulthera devices and/or treatments as a result of the wrongful conduct of Defendants.

**THIRD CAUSE OF ACTION**

**(Violation of California Business & Professions Code § 17200 et seq.)**

85.    Plaintiffs incorporate by reference the allegations contained in each and every paragraph of this Complaint.

86.    Plaintiffs bring this cause of action on behalf of themselves and on behalf of the Nationwide Class, or in the alternative, on behalf of themselves and on behalf of the California Sub-Class.

87.     As a result of their reliance on Defendants' misrepresentations and omissions, Class Members suffered an ascertainable loss of money, property, and/or value of their Ultherapy treatments.

88.     California Business & Professions Code § 17200 prohibits acts of "unfair competition," including any "unlawful, unfair or fraudulent business act or practice" and "unfair, deceptive, untrue or misleading advertising."

89.     Defendants' acts, conduct and practices were unlawful, in that they constituted:

    a.   Violations of California's Consumers Legal Remedies Act;

    b.   Violations of California's False Advertising Law;

    c.   Violations of the Federal Food Drug & Cosmetic Act; and

    d.   Violations of California's Sherman Food, Drug, and Cosmetic Law.

90.     Plaintiffs and Class Members are reasonable consumers who expect manufacturers, like Defendants, to provide lawful, accurate, and truthful representations regarding the safety and efficacy of their products as well as official endorsements indicating such.  Further, reasonable consumers, like Plaintiffs, rely on the representations made by manufacturers regarding the safety and efficacy of products, particularly medical devices and treatments, in determining whether to purchase, and consider that information important to their purchase decision.

91.     In failing to disclose and actively misrepresenting the true nature of the FDA's clearance of Ultherapy, Defendants have knowingly and intentionally misrepresented and concealed material facts and breached its duty not to do so.  Defendants were under a duty to Plaintiffs and Class Members to disclose the distinction between "FDA Approval" and "FDA Clearance" and the true nature of the FDA's review of Ultherapy, because:

    a.   Defendants were in a superior position to know the true nature of FDA clearance;

    b.   Defendants made partial representations about the FDA's involvement with Ultherapy without revealing the material information needed to determine whether to purchase; and

    c.   Defendants actively concealed the true nature of the FDA's involvement with

Ultherapy from Plaintiffs and the Class.

92.     The facts Defendants concealed from or misrepresented to Plaintiffs and Class Members are material in that a reasonable consumer would have considered them to be important in deciding whether to purchase Ultherapy or pay less.  If Plaintiffs and Class Members had known that the Ultherapy was not FDA-approved, they would not have purchased Ultherapy treatments or would have paid less for them.

93.     Defendants' conduct was and is likely to deceive consumers.

94.     By their conduct, Defendants have engaged in unfair competition and unlawful, unfair, and fraudulent business practices.

95.     Defendants' unlawful, unfair, or deceptive acts or practices occurred repeatedly in Defendants' trade or business, and were capable of deceiving a substantial portion of the purchasing public.

96.     As a direct and proximate result of Defendants' unlawful, unfair, and deceptive practices, Plaintiffs and the Class have suffered and will continue to suffer actual damages.

97.     Defendants have been unjustly enriched and should be required to make restitution to Plaintiffs and the Class pursuant to §§ 17203 and 17204 of the Business & Professions Code.

## PRAYER FOR RELIEF

98.     Plaintiffs, on behalf of themselves, and all others similarly situated, request the Court to enter judgment against Defendants, as follows:

 a.     An order certifying the proposed Class and Sub-Classes, designating Plaintiffs as named representatives of the Class, and designating the undersigned as Class Counsel;

 b.     An order enjoining Defendants from further deceptive advertising, sales, and other business practices with respect to its representations regarding the Ulthera System and treatments;

 c.     An injunction ordering Defendants to cease using "FDA approved" on their websites and in advertisements and other marketing materials;

d.  An injunction:

    i.  Ordering Defendants to cease using "FDA cleared," and similar language referencing the FDA on their websites and in advertisements and other marketing materials; or

    ii.  Ordering Defendants to disclose, anytime "FDA cleared" or similar language is used, the distinction between FDA clearance and FDA approval;

e.  A declaration requiring Defendants to comply with the various provisions of the Federal Food Drug & Cosmetic Act, California's False Advertising Law and CLRA alleged herein and to make all the required representations;

f.  An award to Plaintiffs and the Class for compensatory, exemplary, and statutory damages, including interest, in an amount to be proven at trial;

g.  A declaration that Defendants must disgorge, for the benefit of the Class, all or part of the ill-gotten profits it received from the sale of its Ulthera System and treatments, or make full restitution to Plaintiffs and Class Members;

h.  An award of attorneys' fees and costs, as allowed by law;

i.  An award of attorneys' fees and costs pursuant to California Code of Civil Procedure § 1021.5;

j.  An award of pre-judgment and post-judgment interest, as provided by law;

k.  Leave to amend the Complaint to conform to the evidence produced at trial; and

l.  Such other relief as may be appropriate under the circumstances.

## DEMAND FOR JURY TRIAL

Plaintiffs hereby demand a trial by jury of any and all issues in this action so triable.

Dated:  September 29, 2017                    Respectfully submitted,

                                             Capstone Law APC


                                        By: /s/ Bevin Pike
                                             Bevin Allen Pike
                                             Robert K. Friedl
                                             Trisha K. Monesi

                                             Attorneys for Plaintiffs
                                             Georgia Tryan and Marilyn Echols

CLASS ACTION COMPLAINT

# EXHIBIT 1

DocuSign Envelope ID: 7B62CA65-4DA0-4A6D-B017-20D1BD45D0A1

## DECLARATION OF GEORGIA TRYAN

I, GEORGIA TRYAN, declare under penalty of perjury as follows:

1.     I make this declaration based upon my personal knowledge except as to those matters stated herein that are based upon information and belief, and as to those matters I believe them to be true.  I am over the age of eighteen, a citizen of the State of California, and a Plaintiff in this action.

2.     Pursuant to California Civil Code section 1780(d), this Declaration is submitted in support of Plaintiff's Selection of Venue for the Trial of Plaintiffs' Cause of Action alleging violation of California's Consumers Legal Remedies Act.

3.     I reside in Burney, California, which is in the County of Shasta.

4.     On or around November 19, 2015, I purchased an Ultherapy treatment at Orlino Oliva Editha C Inc., a medical practice authorized to perform the Ultherapy procedure, in Redding, California, which is in the County of Shasta.

5.     I am informed and believe that Defendant Merz North America, Inc. ("Merz" or "Defendant") is a Delaware corporation organized and existing under the laws of the State of Delaware, and is registered to conduct business in California.  Defendant Merz's corporate headquarters and principal place of business is located at 6501 Six Forks Road, Raleigh, North Carolina 27615.

6.     I am informed and believe that Defendant Ulthera, Inc. ("Ulthera" or "Defendant") is a Delaware corporation organized and existing under the laws of the State of Delaware.  Defendant Ulthera's principal place of business is located at 1840 S. Stapley Dr., Suite 200, Mesa, Arizona 85204.

7.     On information and belief, Defendants Merz and Ulthera ("Defendants") produce, manufacture, market, distribute, and/or sell the Ulthera System at issue in Plaintiff's Complaint, filed concurrently herewith, in Shasta County and throughout the United States of America.

//

//

DECL. OF GEORGIA TRYAN IN SUPPORT OF PLAINTIFF'S SELECTION OF VENUE FOR TRIAL

DocuSign Envelope ID: 7B62CA65-4DA0-4A6D-B017-20D1BD45D0A1

8.     The transactions described above form the basis of this action, or a substantial portion thereof, and occurred in the County of Shasta.  On information and belief, Defendants conduct business in Shasta County, California, including, but not limited to, marketing, distributing, and/or selling their products to Class Members.  Accordingly, Shasta County is a proper place for trial of this action.

9.     I declare under penalty of perjury under the laws of California and the United States of America that the foregoing is true and correct.

Executed September 9/27, 2017 in Burney, California.



Georgia Tryan

DECL. OF GEORGIA TRYAN IN SUPPORT OF PLAINTIFF'S SELECTION OF VENUE FOR TRIAL